J-A17022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| AYANA BURELL | : | No. 2500 EDA 2022 |

Appeal from the Order Entered September 2, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002464-2022

BEFORE: KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:          **FILED OCTOBER 11, 2023**

The Commonwealth appeals from the order vacating the conviction of

Ayana Burell ("Burell") for simple assault,[1] and vacating, in part, the judgment

of sentence. We reverse.

The trial court provided the factual and procedural history of this case,

which we set forth in relevant part, as follows:

> On January 16, 2020, around 1:00 P.M., [Burell] instigated
> a confrontation with Martina Hudson [("the Victim")] on a public
> highway [in] Philadelphia, Pennsylvania. [Burell] was charged
> with [s]imple [a]ssault[,] and [h]arassment[, 18 Pa.C.S.A.
> § 2709(a)(1)]. [Following convictions for these offenses in
> Municipal Court, Burell appealed to the Court of Common Pleas for
> a trial *de novo*, and she] knowingly and intentionally waived her
> right to a jury trial and proceeded to a waiver trial . . .. [The
> Commonwealth] presented two witnesses as part of its case-in-
> chief, and [Burell] presented one as part of hers. [The

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. § 2701(a)(1).

Commonwealth] first presented the testimony of [the Victim], followed by that of witness Ronald Hudson [("Hudson")], [the Victim's] brother. Finally, [Burell] presented the testimony of witness Corella Lindsey [("Lindsey")]. The trial evidence and testimony are summarized below.

[The Victim] testified [that she] was a passenger in a pickup truck driven by her mother . . .. [She and her mother were traveling to] meet up with her sister-in-law. As the truck approached her sister-in-law's residence, [the Victim] exited the vehicle to meet her sister-in-law, who was waiting on the front steps. [The Victim] testified that as soon as the truck had come to a stop and she began to exit, an occupant of the vehicle directly behind her began honking.

As [the Victim] approached her sister-in-law, the driver of the second vehicle began to yell at her that she had somewhere to be. [The Victim] testified she walked back to the truck slowly due to a concussion she had suffered a few days prior.

As [the Victim] approached her mother's truck, [Burell] exited the passenger side of the second vehicle and approach[ed] her from behind. [The Victim] stated that as she was standing in the truck's passenger doorway, [Burell] told her that "You're a bitch," and spit on her. [The Victim] claimed that she did not witness [Burell] spit on her[,] but heard what she believed to be such an action. According to [the Victim's] testimony, her suspicion was confirmed when [Burell] verbalized that she had spit at her. At this time, [the Victim] saw her brother, Ronald Hudson, exit his residence and travel down the front stairs. She then asked him if indeed [Burell] had spit on her, and he confirmed there was spit on the left side of her jacket. He took pictures of the spit, and [the Victim] called 911. [The Victim] next testified that during this brief interaction with her brother, [Burell] threatened to "beat [her] up[,]" and that[] "[Burell was] yelling, the driver [was] yelling and beeping the horn."

[The Victim] next began to walk towards the rear of the vehicle that [Burell] had been traveling in for the purpose of taking photos of the vehicle's license plate. While traveling towards the rear of the vehicle, [the Victim] began to video record the events as she passed the driver side of the car. As this was in progress, [Burell] also began to walk towards the trunk. As [the Victim] approached the trunk, she verbalized her intent to take the photos. She then testified that upon reaching the rear of the

vehicle, she walked past [] Hudson, who was already positioned behind the vehicle, to begin photographing the plate with her phone. [The Victim] testified that at this moment, ***[Burell] "squares up and she hits me ... [on] my right side of my face and my neck."*** Following the physical altercation, [the Victim] instructed her sister-in-law to make a second call to the police. . . . [The Victim] stated that [] Hudson attempted to strike [Burell] in defense of his sister but failed to make contact.

[The Victim] next testified that at this time the driver of [Burell's] vehicle yelled at [Burell] to return to the car stating, "[Burell] never chill, you never chilling." By this point in time, traffic had started to build behind [Burell's] vehicle. To leave the scene, [Burell's] driver waited for the car behind her to reverse far enough for the driver to back up and turn[, after which Burell] reentered the vehicle and left the scene.

Following [Burell's] departure, [the Victim] testified that [she] went to an urgent care center seeking treatment for her alleged injuries. However, she was informed that[,] due to the allegation of a physical assault, she had to be treated at a hospital. Upon arriving at a nearby hospital, [the Victim] testified she was also denied medical treatment. [The Victim conceded] that the altercation left no physical evidence of injuries on her person.

[Hudson testified that, on the day of the incident, he] was standing in the front doorway of his home anticipating the arrival of his sister. [The Victim] was coming to his home to drop off an ACE bandage to be retrieved by his wife, who was waiting outside. Once his mother and [the Victim] arrived, he saw his sister walk around the front of the truck to meet his wife. As this was occurring, [] Hudson heard a car's horn coming from a vehicle directly behind his mother's. He then observed someone, whom he identified as [Burell], exit the passenger side of the second vehicle and "run up behind my sister."

[] Hudson stated that he next saw the two talking and heard [Burell] say, "that's why I spit on you." Following this exchange, [the Victim] asked [] Hudson if indeed [Burell] had spit on her. He walked down to the street and confirmed this and was then asked by his sister to take a photo of the spit. He did so. However, while [] Hudson was in the process of taking the photograph, he testified that he could still hear[] "bickering" between [the Victim] and [Burell], which only escalated when [the Victim] informed [Burell] of her intent to photograph the second

vehicle's license plate, [after which] the latter became "belligerent."

. . . As [Hudson] stood with his phone [at hand to take his own photograph of Burell's vehicle], the, "next thing I know is, I just see a hand swinging over top of me" in what he described as[] "a windmill kind of punch." However, [] Hudson specified that he did not see [Burell's] hand make impact with [the Victim's] body, but that he heard the connection. As an immediate defensive response to this physical action[,] [] Hudson, "swung back, but I didn't hit nobody."

After he recounted hearing the "windmill punch," [] Hudson testified that multiple cars had accrued in traffic behind [Burell's] vehicle during this altercation. He stated that[,] following the "windmill punch," occupants of the other cars exited their vehicles and, "interject[ed], saying, [']well you all not going to be jumping her out here[']" and this interjection, " kind of broke up everything or whatever." He heard [Burell's] driver screaming at [Burell], demanding she return to the car. [Burell's] driver subsequently put her car in reverse and backed up[, after which Burell] entered [the] vehicle, and the two drove away.

Finally, [Burell] called her only witness, the driver of the vehicle of [*sic*] which she had been traveling, Corella Lindsey [("Lindsey")]. Her testimony is as follows. Acting first as a character witness, [] Lindsey testified that [Burell] possessed a reputation for peacefulness in the community.

Pertaining to the events in question, [] Lindsey stated that on the day in question, both [she] and [Burell] were in route to make deliveries for Uber Eats when their car was forced to stop behind a truck that was "holding up the block." She testified that she began honking her horn after two or three minutes had passed. She also verbally made [the Victim] aware of the nature of their travels. In response, [the Victim] became "irate" and told [] Lindsey that she would have to continue to wait.

[] Lindsey stated that it was at this point that "an argument broke out," and that [] Hudson and unidentified others exited [] Hudson's home. She testified that the situation was compounded when a bus stopped behind the two vehicles wherein the passengers exited to urge [the Victim's] mother's vehicle to move.[] Lindsey testified that at no time did she witness [Burell] hit [the Victim]. When shown a screenshot take from the video [the Victim] had recorded[,] . . . which displayed a closed fist

previously identified by both [the Victim] and [] Hudson as [Burell's], she gave a non-committal answer that person's hand and arm were those of a person who was, "a little thick[.]"  When a longer segment of the video was shown to [] Lindsey, she denied that a voice on the recording of a woman screaming was [Burell's]. Finally, [] Lindsey testified that she observed [] Hudson charge towards [Burell].  She gave only conjecture as to his motive for such behavior, "I guess he must of thought . . . [Burell] and his sister was about to fight or something[.]"

Trial Court Opinion, 11/9/22, unnumbered at 1-6 (subheadings, footnote, and citations to the record omitted; emphasis added).

At the conclusion of the non-jury trial, the trial court convicted Burell of simple assault and harassment.  *See* N.T., 8/26/22, at 58.  The court sentenced Burell to two years of probation for the simple assault conviction. *See id*. at 62-63.  A week later, the trial court *sua sponte* reconsidered its verdict and entered an order vacating the simple assault conviction based on its conclusion that the evidence was insufficient.  *See*, *e.g.*, N.T., 9/2/22, at 5.  The trial court characterized its ruling as granting a motion in arrest of judgment, even though Burell filed no such motion.  *See* Trial Court Opinion, 11/9/22, unnumbered at 8.  The trial court thereafter sentenced Burell to, *inter alia*, ninety days of probation for summary harassment.  *See* N.T., 9/2/22, at 10.  The Commonwealth timely appealed.  *See* Notice of Appeal, 9/29/22.  Both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

The Commonwealth raises the following issue for our review:

Did the lower court err in reconsidering *sua sponte* its verdict convicting [Burell] of simple assault[,] when the judgment

convicting [Burell] of that offense was amply supported by sufficient evidence?

Commonwealth's Brief at 4.

Our standard of review for an order granting a motion in arrest of judgment is as follows:

> In passing upon such a motion in arrest of judgment, the sufficiency of the evidence must be evaluated upon the **entire trial record**.  All of the evidence must be read in the light most favorable to the Commonwealth and it is entitled to all reasonable inferences arising therefrom.  The effect of such a motion is to admit all the facts which the Commonwealth's evidence tends to prove.

**Commonwealth v. Johnson**, 631 A.2d 639, 642 (Pa. Super. 1993) (internal citations, quotations, brackets and ellipses omitted; emphasis in original).

The Commonwealth challenges the trial court's order vacating Burell's simple assault conviction based on the insufficiency of the evidence.  This Court has previously provided:

> In order for a trial court to properly grant a criminal defendant's motion in arrest of judgment on the ground of insufficient evidence, it must be determined that accepting all of the evidence and all reasonable inferences therefrom, upon which, if believed the verdict could properly have been based, it would be nonetheless insufficient in law to find beyond a reasonable doubt that the defendant is guilty of the crime charged.

**Id**.  Additionally, "[p]ursuant to Pa.R.Crim.P. 621, when a case proceeds non-jury the court must render a verdict 'which shall have the same force and effect as a verdict of a jury.'  Thus, . . . the court's verdict [is] the same as if rendered by a jury."  **Commonwealth v. Farinella**, 887 A.2d 273, 275 (Pa. Super. 2005).  Therefore, "[t]he fact that it was the court that reached the

verdict [does] not make the verdict less firm than a jury verdict, nor [does] it make it malleable and capable of later revision by the court." *Id*. "[O]nce announced in open court, there [is] no basis for 'looking behind' the verdict to the factfinder's reasoning or specific findings of fact, nor [is] there a basis for correcting what was, upon its face, a perfectly valid verdict." *Id*. at 276 (internal citation omitted). Following a verdict, "the only options left to [the defendant are] to attack the sufficiency of the evidence or assert that the verdict was against the weight of the evidence." *Id*.

Additionally, while 42 Pa.C.S.A. § 5505, authorizes a trial court to modify or rescind orders within thirty days after entry, "it is evident that the reconsideration procedure authorized by 42 Pa.C.S.A. § 5505 does not extend to the trial court the authority to change a previously recorded verdict of guilty to one of not guilty." *Commonwealth v. Parker*, 451 A.2d 767, 770 (Pa. Super. 1982) (vacating an order changing a guilty verdict to not guilty, noting that a trial court's authority "is limited to consideration of post-verdict motions in arrest of judgment or the granting of a new trial," and holding the trial court "exceeded its post-verdict authority" by *sua sponte* reconsidering its verdict); *accord Commonwealth v. Robinson*, 33 A.3d 89, 93 (Pa. Super. 2011) (holding that a trial court is unauthorized to *sua sponte* change its verdict and vacate a sentence).

Section 2701(a)(1) of the Crimes Code provides that a person is guilty of simple assault if she "**attempts** to cause or intentionally, knowingly or

recklessly causes bodily injury to another." 18 Pa.C.S.A. § 2701(a)(1) (emphasis added). The Crimes Code defines "bodily injury" as "impairment of physical condition or substantial pain." 18 Pa.C.S.A. § 2301. "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901. The intent to commit simple assault "may be shown by circumstances which reasonably suggest that a defendant intended to cause injury." *Commonwealth v. Richardson*, 636 A.2d 1195, 1196 (Pa. Super. 1994). A fact-finder may infer the requisite intent when a defendant takes a swing at another person's face in anger. *See id*. at 1197.

The Commonwealth maintains the trial court erred in two respects. First: Burell never moved for an arrest of judgment; therefore, there was no motion to grant, and the trial court thus had no authority to grant the non-existent motion. *See* Commonwealth's Brief at 12. Second: even if the trial court were authorized to grant the motion, the evidence, under the proper standard of review, was sufficient to sustain the simple assault conviction. *See id*. at 15-20.[2]

---

[2] Burell argues the Commonwealth waived its issue insofar as it argues the evidence was sufficient to sustain the conviction because this issue was not specified in the Commonwealth's Rule 1925(b) statement. *See* Burell's Brief at 9. According to Burell, even if the trial court "correctly guess[es]" the issues an appellant seeks to have reviewed, a vague 1925(b) statement waives the issues therein. *See id*. at 12. However, our Supreme Court has recently directed that, where "the brevity of [an a]ppellant's . . . claim as set forth in
*(Footnote Continued Next Page)*

The trial court considered the Commonwealth's issue and determined the Commonwealth was due no relief:

> [T]he [t]rial [c]ourt's *sua sponte* reconsideration of its initial verdict was predicated only on a finding that [Burell's] actions did not meet the threshold of the elements of [s]imple [a]ssault. The [c]ourt did not reweigh the credibility of any witness nor the importance or unimportance of any physical evidence. The [c]ourt simply ruled, based on all evidence presented and acknowledged at trial, [Burell's] actions were ultimately insufficient to have justified the [c]ourt's original verdict. The reevaluation of what elements of [s]imple [a]ssault were met in no way contradicts nor

---

[the] concise statement represents a good-faith attempt to comply with Rule 1925's concision requirement, and that it [does] not prevent meaningful appellate review[,] . . the intermediate court should . . . consider[] the claim on its merits"). ***Commonwealth v. Rogers***, 250 A.3d 1209, 1225 (Pa. 2021). Our Supreme Court noted that it had previously directed this Court to review the merits of a claim where the Rule 1925(b) statement was "exceedingly brief," but the trial court issued a responsive Rule 1925(a) opinion resolving the claim on its merits, and the legal issue was "fairly evident," and the trial court "readily apprehended the claim. ***See id***. at 1224 (discussing and applying ***Commonwealth v. Laboy***, 936 A.2d 1058 (Pa. 2007) (*per curiam*)).

We observe that, in this case, the Commonwealth raised its sufficiency argument below. ***See*** N.T., 9/2/22, at 7 (Commonwealth arguing that the trial court was applying the incorrect standard of review in assessing the sufficiency of the evidence). Further, despite the Commonwealth's inartful Rule 1925(b) statement, the trial court readily apprehended and addressed the sufficiency argument. ***See*** Trial Court Opinion, 11/9/22, at unnumbered 8-10. Lastly, a trial court's authority to grant a motion in arrest of judgment is intertwined with the sufficiency of the evidence. ***See Commonwealth v. Stark***, 584 A.2d 289, 291 (Pa. 1990) (stating that "[i]t is well settled that only causes appearing on the face of the record or insufficiency of the evidence will justify the grant of a motion in arrest of judgment"). Therefore, we decline to find waiver in this instance, and, accordingly, address the Commonwealth's sufficiency argument. However, we further note, as discussed further ***infra***, that the single issue which is indisputably preserved, *i.e.*, the trial court's authority to *sua sponte* vacate its own verdict, would, in any event, be dispositive.

alters what the [c]ourt originally ruled on the facts present[] in any manner. Therefore, the [c]ourt properly exercised its right to vacate a judgment based on facts for which the [c]ourt later realized were insufficient to make out the statutory offense.

* * * *

In the instant matter, the "windmill punch" by [Burell] resulted in an inadvertent contact with [the Victim], which caused no physical marks, blemishes, punches, tears, or scrapes. [The Victim] received no medical care at any time following the altercation. The brief pain that [the Victim] allegedly endured during the event is not the kind the laws of this Commonwealth were designed to protect against. Such behavior is to be prevented through social mores and not judicial proceedings.

[Burell] had no intent to injure [the Victim] during the interaction. [Burell's] hand motion, that of a windmill gesture over [] Hudson, was designed only to knock [the Victim's] phone from her grasp and halt the recording of events. [Burell's] arm swing demonstrated she acted in an unacceptable manner to both the property and personal space of [the Victim] and [] Hudson, but also that she had no intention to harm either of them physically. On the record at [trial] and reconsideration, this [c]ourt noted that [Burell's] intentions were to prevent the recording of the altercation and not to inflict or attempt to inflict bodily injury upon [the Victim]. While [Burell's] actions clearly demonstrate inappropriate, even anti-social behavior, they do not rise to the level of criminal simple assault.

Trial Court Opinion, 11/9/22, unnumbered at 8-10 (footnote omitted).

Following our review, we conclude the trial court erred in *sua sponte* vacating Burell's simple assault conviction. The trial court convicted Burell of simple assault. This verdict had the same effect as a jury verdict, and the trial court had "no more power to change the verdict than it would have had in a jury trial." *Farinella*, 887 A.2d at 275 (internal citation omitted). After the verdict, Burell had the option of filing a motion in arrest of judgment and

- 10 -

thereby challenge the sufficiency of the evidence. *See id*. at 276. Burell filed no motion. The trial court thus had no motion before it to rule on, and its order vacating the simple assault conviction was a legal nullity. *See Stark*, 584 A.2d at 290 (stating that the trial court's authority over the verdict "is limited to consideration of post[-]verdict *motions* in arrest of judgment or the granting of a new trial") (emphasis added). Thus, on this basis alone, the trial court's order must be reversed.

However, even if the trial court were empowered to *sua sponte* enter an order granting a motion in arrest of judgment, the trial court erred by applying the wrong standard of review. We explain: this Court has held that if a defendant had moved "for an arrest of judgment, the trial court would have been required to view the evidence in the light most favorable to the Commonwealth as verdict winner and could not have altered the verdicts based upon a redetermination of credibility or a re-evaluation of the evidence." *Johnson*, 631 A.2d at 643. Here, the trial court erred by failing to apply the appropriate standard, *i.e.*, by not viewing the evidence in the light most favorable to the Commonwealth as the verdict winner. The Victim testified that, "[A]s I was walking past, out of nowhere[,] [Burell] balled up the fist and squares up and proceeded to punch me on the right side of my face." N.T., 8/6/22, at 17. Hudson saw Burell swing a closed fist and heard it make contact with his sister. *See id*. at 41. The evidence in the light most favorable to the Commonwealth establishes that, in the midst of the altercation, and

after Burell yelled and spit at the Victim, Burell swung a closed fist which made contact with the Victim's face. This was sufficient to support a finding of attempt to cause bodily injury. **See Richardson**, 636 A.2d at 1197.[3]

Therefore, we reverse the trial court's order vacating the simple assault conviction and judgment of sentence, and we remand for reinstatement of that conviction and reimposition of the probationary sentence.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge King joins this memorandum.

Judge Pellegrini files a concurring memorandum.

---

[3] We observe the trial court's assertion that its *sua sponte* reconsideration "of its initial verdict was predicated only on a finding that [Burell's] actions did not meet the threshold of the elements of [s]imple [a]ssault," and that it did not "reweigh the credibility of any witness nor the importance or unimportance of any physical evidence," and that it "in no way contradicts nor alters what the [c]ourt originally ruled on . . .." Trial Court Opinion, 11/9/22, unnumbered at 8. We disagree. The trial court, at the conclusion of the trial, found that the evidence established that Burell had a "balled up" fist, and asked rhetorically, "Why is she doing that but for the fact that she is taking a swing at somebody? We just don't walk around with balled up hands." N.T., 8/26/22, at 56. Further, the court found at the conclusion of the trial that "[Burell] got out of the vehicle . . . for what other purpose but to escalate a fight . . .. She made physical contact with another person. . . . I believe the [Victim], that she was punched in the head one time, which is a simple assault by definition." **Id**. Only later did the trial court re-weigh the evidence and conclude that "it was inadvertent contact that was made with the [Victim]." N.T., 9/2/22, at 5.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>October 11, 2023</u>